# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
April 10, 2003 Session
Heard at Dyersburg[1]

## STATE OF TENNESSEE v. CHRISTOPHER M. FLAKE

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 97-09254 & 97-09255      Bernie Weinman, Judge**

---

**No. W2001-00568-SC-R11-CD - Filed August 5, 2003**

---

The defendant, Christopher Flake, was indicted by the Shelby County Grand Jury on two counts of premeditated first degree murder for the shooting deaths of Mike Fultz and Fred Bizot. The facts surrounding the shootings were not contested at trial. Instead, the defense focused upon establishing the affirmative defense of insanity. See Tenn. Code Ann. § 39-11-501. The jury rejected the insanity defense, however, and found the defendant guilty on both counts of premeditated first degree murder. The defendant was sentenced to consecutive sentences of life imprisonment without the possibility of parole. The trial court entered a judgment in accordance with the jury's verdict, and the defendant appealed, asserting, among other things, that the insanity defense had been established by clear and convincing evidence and that the jury had erred in rejecting it. The Court of Criminal Appeals agreed with the defendant, modified the verdict to not guilty by reason of insanity, and remanded the case to the trial court for further proceedings in accordance with Tennessee Code Annotated section 33-7-303. The State filed an application for permission to appeal arguing that the intermediate appellate court had erred by reversing the jury's verdict.

We granted the State's application to consider this case in light of State v. Flake, 88 S.W.3d 540, 542 (Tenn. 2002) ("Flake I"), rendered after the Court of Criminal Appeals' decision in this case. In Flake I, this Court unanimously held that "an appellate court should reverse a jury verdict rejecting the insanity defense only if, after viewing the evidence in the light most favorable to the State, the appellate court concludes that no reasonable trier of fact could have failed to find that the defendant's insanity at the time of committing the offense was established by clear and convincing evidence." After reviewing the evidence in this record in the light most favorable to the State, a majority of this Court is unable to conclude that no reasonable juror could have failed to find that the defendant's insanity at the time of committing the offenses was established by clear and convincing evidence. Accordingly, that portion of the judgment of the Court of Criminal Appeals modifying the verdict

[1]This case was heard as part of the April 10, 2003, S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project in Dyersburg, Dyer County, Tennessee.

to not guilty by reason of insanity is reversed.  As to the defendant's claim that the trial court erred in denying his motion to suppress, the judgment of the Court of Criminal Appeals is affirmed.  The judgment of the trial court is reinstated.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed in Part and Affirmed in Part; Judgment of the Trial Court Reinstated**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined.

E. RILEY ANDERSON filed a dissenting opinion, in which ADOLPHO A. BIRCH, JR., J., joined.

ADOLPHO A. BIRCH, JR., J., filed a dissenting opinion.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Kim R. Helper, Assistant Attorney General; William L. Gibbons, District Attorney General; Thomas D. Henderson and John W. Campbell, Assistant District Attorneys General, for the appellant, State of Tennessee.

Leslie I. Ballin, Memphis, Tennessee, and Steven E. Farese, Ashland, Mississippi,  for the appellee, Christopher M. Flake.

## OPINION

### Facts

As stated, the primary issue in this appeal is whether the jury erroneously rejected the insanity defense.[2]  In determining a defendant's sanity, jurors may consider the facts surrounding the crime as well as the testimony of lay and expert witnesses; therefore, the proof offered at trial is summarized in detail hereafter.

On March 19, 1997, the defendant, twenty-five-year-old Christopher Flake, applied to purchase a Jennings Model J-25 automatic pistol at Guns and Ammo in Memphis, Tennessee.  State law mandated a background check and a fifteen-day waiting period.  The defendant completed the required paperwork, providing background information that indicated he was not addicted to drugs or alcohol and had never been hospitalized or treated for mental illness.  The application was processed; the retailer received the Sheriff's Department clearance for the defendant's application; and on April 4, 1997, the day on which the mandatory waiting period expired, the defendant returned to Guns and Ammo and retrieved the weapon.  The defendant completed another form, and in

---

[2]Insanity was the primary issue at trial as well.  In opening statements defense counsel informed the jury "[t]his is not a case of who, cause we submit to you on this journey that you're about to embark upon as jurors in this case, it will be shown to you beyond a reasonable doubt as to who is responsible."

response to specific questions, again indicated that he had not used drugs and had not been committed to a mental institution. The next day, Saturday, April 5, 1997, the defendant committed these murders.

The defendant was a friend and part-time employee of the first victim, thirty-one-year-old Mike Fultz. Angela Fultz, the victim's wife, had no knowledge of animosity between her husband and the defendant. The defendant was one of the last names she gave the police as possible suspects. She said her husband was kind to the defendant, explaining that the victim hired Flake, often gave him rides to work, and occasionally socialized with the defendant.

Mike and Angela Fultz spent the day at their home on April 5, 1997. At approximately 7 p.m., Angela Fultz took a bath in the back of the house and left the television on in the adjoining bedroom. Afterwards, she called for her husband to help with the laundry. She looked for him when he did not respond and found her husband in the garage lying unconscious in a pool of blood. She called for emergency assistance, believing he had fallen and injured his head. The medical technicians discovered that Mike Fultz had been shot five times. Arriving on the scene at approximately 7:55 p.m., Officer Jason Pagenkopf of the Shelby County Sheriff's Department found five .25 caliber shell casings inside the Fultzes' garage.

Prior to the shooting, Anthony Turner, a neighbor of the Fultzes, noticed a man in an unfamiliar car parked near his residence. When the car remained in the same location for approximately thirty minutes, Turner decided to approach the car and ask the man's purpose. However, as Turner approached, the car pulled away and parked in front of the Fultzes' home. Turner returned to his home, believing the man in the car knew the Fultzes. After the shooting, Turner identified the car he had seen as that owned by the defendant and identified the defendant as the driver of the car. Another neighbor, Bernard Leo Miller, was working in his garage that evening when he heard what he believed to be five or six fireworks shots. A short time later, Miller saw a light-colored car with metallic paint and tinted windows drive away from the Fultzes' house.

That same evening, between 7:55 and 8 p.m., the second victim, seventy- year-old Fred Bizot, was shot in the parking lot of the Church of the Holy Apostle in Memphis. Bizot regularly attended the 8 p.m. Alcoholics Anonymous ("A.A.") meeting at that location. Testimony indicated that Bizot had been active in A.A. for approximately seventeen years and that he was particularly helpful and friendly toward younger members. At approximately 7:55 p.m., Robert Wilford Gragg was walking through the parking lot of the church when he noticed Bizot "warmly" greet another individual, but Gragg did not turn to look at this individual. Just as he was entering the church, Gragg heard what he thought was a car backfire, and turning, he saw a "rackety" car go by the church. Some ten minutes after the meeting began, another attendee walked in the back door and said "Fred was laid out on the ground outside." Bizot was unconscious and lying in the grass between the parking lot and the church. Medical personnel discovered that Bizot had been shot once in the chest.

The next day, Sunday, April 6, 1997, Turner Carpenter, a pastoral counselor at Central Church in Memphis was shot. However, Carpenter survived the shooting and provided information to the police that enabled them to identify the defendant as his assailant. Flake I, 88 S.W.3d at 543. Acting on this information, Shelby County Sheriff's Department Officer Robert Brandon Lampley and another officer proceeded to the residence the defendant shared with his parents in Germantown. About thirty minutes later, the defendant arrived and exited his vehicle. With guns drawn, Officer Lampley and another officer walked toward the defendant, and one officer yelled, "Christopher." The defendant stopped, and as the officer approached, a man, who Officer Lampley later learned was the defendant's father, walked out of the house and spoke to the defendant. Officer Lampley holstered his gun, and after conducting a pat-down search, the officers handcuffed the defendant and placed him inside the patrol car. Officer Lampley testified that the defendant cooperated but showed no emotion during his arrest.

After verbally advising the defendant of his constitutional rights, Detective Johnny Brown asked the defendant if he knew why the officers were there. The defendant responded, "yes." Detective Brown then asked if the weapon was in his vehicle, and the defendant again responded, "yes." In response to further questioning, the defendant advised that the weapon was in the glove compartment. Detective Brown then read a consent to search form to the defendant, and the defendant executed the form, which was witnessed by two other officers. From the glove compartment officers seized a loaded Jennings automatic .25 caliber pistol, and they also recovered a shell casing from the right rear seat of the vehicle. When Detective Brown asked if he had attended an A.A. meeting on Hickory Hill the previous evening, the defendant was unsure of the location, but when Detective Brown mentioned the Church of the Holy Apostle, the defendant indicated that he had attended the meeting. When asked, "Did you get in an altercation there," the defendant responded, "yes." And, when asked, "What happened?" the defendant responded, "I shot the guy." Detective Brown said the defendant looked "tired" and showed no emotion.

Detective Eddie Scallions of the Shelby County Sheriff's Department investigated the shootings. Detective Scallions executed a search warrant for the residence the defendant shared with his parents. In the defendant's bedroom Detective Scallions found an empty box of .22 caliber cartridges, several live .22 caliber rounds, and a box for a Jennings Model J.25 pistol, which contained the Guns and Ammo receipt. Detective Scallions also found prescription bottles belonging to the defendant which contained Zoloft, Prozac, and Cylert. Some of the prescriptions dated to more than one year before the shootings, but, based on the contents of each bottle, the defendant had not regularly taken the medication.[3]

Dr. O.C. Smith, head of the forensic pathology division at the University of Tennessee in Memphis, performed both autopsies and testified about the victims' injuries. Dr. Smith testified that

---

[3]Detective Scallions found a February 23, 1996 prescription bottle for twice-daily Zoloft, containing twenty-six capsules, an October 30, 1996 prescription bottle for once-daily Cylert containing thirty-five tablets, a November 13, 1996 prescription bottle for three-daily Cylert containing twenty-eight tablets, and a November 15, 1996 prescription bottle for once-daily Zoloft containing 129 tablets.

Fultz's death was caused by multiple gunshot wounds to his chest and back, which struck his lungs, heart, liver, and diaphragm, causing a great deal of bleeding into his chest cavity. Five bullets were recovered from Fultz's body. Dr. Smith testifed that Bizot's death resulted from a single gunshot wound to his chest which traveled from left to right, striking his aorta, lung, and diaphragm, causing a great deal of blood loss which interfered with his breathing. One bullet was recovered from his body. According to Dr. Smith, neither victim lived longer than four to five minutes after being shot. Steve Scott, with the firearms identification unit of the Tennessee Bureau of Investigation ("TBI"), testified that ballistics tests revealed that the bullets recovered from the victims' bodies were fired from the gun seized from the defendant's car.

The prosecution offered no further proof; however, the defense called several witnesses in support of the affirmative defense of insanity. Michael Todd Musso, the defendant's co-worker at Cooper Moving Company, testified that he had worked with the defendant for over one year prior to these shootings. Musso characterized the defendant as "just kind of out there." Musso had previously complained about the defendant's poor work performance; however, on the day of these shootings, Musso described the defendant's work performance as "really bad." Musso stated that the defendant appeared unusually agitated and that he stopped to smoke five to seven times in the customer's presence, which was strange since Musso and Flake were being paid by the hour. Musso also recalled that the defendant was particularly untalkative, speaking only when he needed a tool and when he borrowed money for lunch. Musso remembered that the defendant ate very little food after borrowing the money to purchase it and instead tore his hamburger into small pieces. At the end of the day, Musso again complained about the defendant's poor work performance and informed their supervisor that he would not work with the defendant again. When Musso left, the defendant was waiting outside their supervisor's office.

Testifying next for the defense was the defendant's father, James R. Flake ("Mr. Flake"), who graduated from law school in 1969 and has been a special agent with the Federal Bureau of Investigation ("FBI") since 1977. Mr. Flake recounted that at age three, the defendant experienced serious medical problems which required the removal of a kidney and limited to some extent the defendant's activities. While Mr. Flake was reluctant to describe the defendant as "babied," he testified that both parents were very concerned about the defendant because of their fear that his remaining healthy kidney would be damaged. Mr. Flake said the defendant was an exceptional child, described as a "leader" by his teachers, until he began having emotional problems at age eleven or twelve. Mr. Flake said the defendant then became a "follower," talked very little, and had few friends. The defendant's academic performance declined, and he began having disciplinary problems at school.

During his freshman year of high school, the defendant and his father consulted a church counselor, but the counselor indicated that he was not qualified to address the defendant's problems and suggested the defendant consult a psychiatrist or psychologist. Mr. Flake followed the counselor's advice and consulted a psychologist, Dr. Richard Luscomb, who treated the defendant for three to four years. Mr. Flake and his wife attended the treatment sessions as well. The defendant began drinking heavily during this time and became very depressed, staying in bed a lot,

and his academic performance continued to decline. The defendant was hospitalized for a sixty-day period in 1988 after he came home drunk from his part-time job. After the defendant's release, Mr. Flake, his wife, and the defendant, attended A.A. meetings and other similar meetings six nights per week, but the defendant's condition did not improve. In 1989, the defendant voluntarily re-entered the hospital for another sixty-day period. After being discharged, the defendant and his parents attended A.A. meetings and a support group at the defendant's high school for students with alcohol and drug dependency problems, but his condition deteriorated. The defendant was angry, frustrated, and depressed. In 1990, as a high school senior, he again voluntarily entered the hospital. He was treated by three different mental health professionals, but Mr. Flake saw no improvement.

After graduating from high school, the defendant enrolled at Northwest Mississippi Junior College, but dropped out after one semester. According to Mr. Flake, the defendant became frustrated, angry, and depressed because of his poor academic performance. The defendant then enrolled at the University of Tennessee at Martin ("UT-Martin"). He shared a room with another young man who also attended A.A. One of Mr. Flake's friends, a retired FBI agent, taught in the criminal justice program at UT-Martin, so the defendant enrolled in that program. According to Mr. Flake, the defendant did "fairly well, academically" at UT-Martin, but he did not like the town and came home on weekends. He was very upset that he was not accepted into a particular fraternity. Although the defendant was depressed and angry to the point that he largely remained in bed on weekends, he continued to regularly attend A.A. meetings while he attended UT-Martin, from August 1991 to May 1993.

After leaving UT-Martin, the defendant enrolled at Shelby State Community College and attended from 1993 to 1995. However, he performed poorly, managing only a 1.8 grade point average before dropping out of Shelby State. During this time, the defendant was under the care of a psychiatrist, Dr. Melvin Goldin. However, Mr. Flake testified that he continued to be depressed and reserved. The defendant also made comments such as "my head's messed up," "my mind's blank," and "I don't know who I am," indicating that he had not known "who I am" since moving from Baltimore to Memphis as a young child.

In 1995, the defendant began treatment with Dr. Janet Johnson at Lakeside Hospital, but Mr. Flake testified that by this time the defendant had no confidence that doctors or medication could help him. In the fall of 1996, the defendant cut himself off from everyone, refusing to take telephone calls and stating that his father was the only person he could trust. He was fired from one job for fighting with a co-worker and lost another job because, after three weeks, he failed to learn the menu. During this time, the defendant was enrolled in six courses at the University of Memphis, three of these criminal justice courses, but he passed only two courses and withdrew from the remaining four courses. During this time, the defendant's academic skills seemed to disappear. Mr. Flake compared the defendant's handwriting to that of an elementary school student.

Mr. Flake said the defendant's behavior became increasingly bizarre in the months and days leading up to the shootings. For example, a few months before the shootings, the defendant told Mr. Flake that he did not trust his longtime A.A. sponsor and believed that he was running drugs from

Mexico. The defendant also expressed fear that another A.A. member was planning to beat him to death with a baseball bat. At about this same time, Mr. Flake discovered a piece of paper on which the defendant had scribbled, "Hazel Goodall, the first woman to hit me." Hazel Goodall was the defendant's elementary school principal, at least ten years earlier.

Several days later, the defendant informed Mr. Flake that he had caused a Florida plane crash because he had traveled to Florida two years earlier. A few days later, the defendant remarked that he had seen a former classmate at a service station and then whispered, "Buchanani, has the answer." When asked to explain, the defendant claimed that Buchanani had said that another high school student and an elementary school teacher had "bad-mouthed" him, thereby preventing him from being elected the most popular student in the school. After saying, "[t]he answer is getting closer, I'm getting closer to the answer," the defendant gave his father the former classmate's business card and emphasized the importance of his father keeping the card.

The defendant also became convinced that a couple he had moved from North Carolina to Memphis had taken the truck belonging to one of his A.A. friends who had moved from Memphis to North Carolina. After mentioning that the couple and his friend had similar trucks, the defendant commented that "something was wrong" and asked Mr. Flake to keep some paperwork from the moving company. According to Mr. Flake, having a conversation with the defendant was very difficult.

In March of 1997, the defendant told his father that he knew who was responsible for the Oklahoma City bombing, the 1993 World Trade Center bombing, and the Pan America airline bombing. In explaining why he did not ask the defendant to disclose the identity of the responsible party, Mr. Flake stated: "I was afraid to ask him. I wanted the specialist that he was seeing to ask him who it was because I felt like that she would then know how to deal with his answer." Also in March of 1997, the defendant drove bare-footed, in a thunderstorm, to a convenience market during the middle of the night, took a pack of cigarettes from the shelf, waved to the clerk, smiled, walked out without paying for the cigarettes, and drove away. When the police arrived at the defendant's home to investigate the theft, Mr. Flake explained that the defendant was under the care of a psychiatrist. The police indicated that no charges would be brought if the defendant paid for the cigarettes, so Mr. Flake drove the defendant back to the market and insisted that he pay for the cigarettes. The defendant was very angry and had no remorse for the incident, instead insisting that he had been smoking for a long time, and that "they" owed him the cigarettes.

As a result of this bizarre behavior, Mr. Flake arranged for the defendant to meet with Dr. Janet Johnson on April 1, just four days before these shootings. On April 2, Mr. Flake received a call from Dr. Johnson, who explained that she had been telephoned by a man who had seen the defendant place an envelope in his mailbox. The envelope contained samples of the prescription medication Prozac that Dr. Johnson had given the defendant during their meeting the previous day. When confronted, the defendant informed his father that he had seen the man working under the hood of a truck and believed that he was in trouble and needed the medicine. About this same time, the defendant also set off a fire alarm at the University of Memphis, and when asked about this

incident, he explained that the professor had changed the class assignment, that the class had been in chaos, and that triggering the fire alarm had seemed to be the appropriate action. When Mr. Flake asked the defendant what was causing him to do such strange things, the defendant looked at him for ten seconds or more before replying that the opening of the new Wolfchase Galleria Mall had caused his strange behavior. Mr. Flake testified that he was "petrified" by the look in the defendant's eyes. Believing that his son had "lost his mind," Mr. Flake scheduled another appointment with Dr. Johnson for April 3, 1997. At this appointment, both Mr. Flake and Dr. Johnson tried to persuade the defendant to voluntarily commit himself, but he refused, saying "they" had never helped him before and he believed everything was okay.

Mr. Flake recalled that on the day of the shootings, the defendant left at his usual time to attend the A.A. meeting and returned home at approximately 11:00 p.m. Upon hearing him return, Mr. Flake asked if everything was alright, and the defendant responded "yes." The defendant came downstairs the next day, hugged and kissed his mother, ate breakfast, worked on his car, took his dog to the park, grilled outside with his family, and made plans to watch a movie later that night. The defendant left at approximately 5:30 p.m., and told his father that he was going to a meeting at Central Church. Mr. Flake described the defendant's demeanor as "[p]erfectly, fine. Came downstairs, hugged and kissed his mother, that's it, just a regular day."

After receiving a telephone call at approximately 6:20 p.m. from an unknown person at the Shelby County Sheriff's Department advising him that the defendant was a suspect in a shooting, Mr. Flake looked in the defendant's room and saw what he thought could be evidence. He then returned to the kitchen without disturbing the evidence and waited for the defendant to arrive. He met the defendant outside and advised him to cooperate with the police officers and allow them to handcuff him. Mr. Flake said the defendant had a "blank look" in his eyes and on his face and was "unmoved" during the arrest – not trembling or upset.

On cross-examination Mr. Flake acknowledged that the defendant had been drinking alcohol on and off since age twelve, when his emotional problems reportedly began. When the defendant came home intoxicated at age fifteen, he attempted to strike his father, and the defendant's first sixty-day hospitalization came after this episode. At age eighteen or nineteen, the defendant physically attacked his mother and was forced to move out of the family residence for a time. Mr. Flake also acknowledged that the defendant had a gambling problem, losing approximately $1500 in a casino at one point, which resulted in Mr. Flake terminating the defendant's weekly allowance. Furthermore, Mr. Flake admitted that the defendant had not been honest about his alcohol and drug problems in the past, and he conceded that the defendant had initially lied about the stolen cigarettes, maintaining that the market clerk had given them to him. Mr. Flake said he knew the defendant had been considering purchasing a gun, but he believed the defendant had taken his advice and abandoned the idea. Mr. Flake further acknowledged that the defendant had fired guns at FBI picnics when he was very young, that the FBI teaches agents to aim for the "center of mass" – the torso or chest area of the body – when firing a weapon, and that the victims in this case were shot in that area of their bodies.

As to the defendant's mental state, Mr. Flake agreed that the defendant was "not all that depressed" on April 6, 1997, the day after these shootings, describing it as a "good day" for the defendant. Mr. Flake admitted that the defendant's treating physician at the time, Dr. Johnson, believed that he was an alcoholic and a drug addict. Mr. Flake further testified that the defendant had told him he was no longer going to work for Mike Fultz because Fultz had sent him to a house guarded by four or five dogs and because Fultz sank boats in the Gulf of Mexico to collect the insurance proceeds. Finally, Mr. Flake testified that he had attended more than half of the defendant's treatment sessions, that the defendant had signed waivers allowing him to have access to the defendant's psychological records, and that the defendant had never reported hearing voices until April 9, 1997, three days after his arrest for these crimes. Mr. Flake acknowledged that the report was given only after his wife asked the defendant if he ever heard voices, to which the defendant responded, "yes, they told me to shoot the people." When Mrs. Flake asked how long he had been hearing the voices, the defendant replied, "since I was in treatment."

Testifying next for the defense was Turner Carpenter, who was introduced to the defendant by the pastor of his church, Central Church. Carpenter's pastor described the defendant as an alcoholic who had not drank in three years but had been unable to obtain serenity. Carpenter, a pastoral counselor at the Central Church responsible for an outreach program for addictions and dependencies, agreed to meet with the defendant. After the defendant made, but failed to keep, several appointments, Carpenter suggested that the defendant attend the group dependency meetings until a workable schedule for individual sessions could be arranged. Shortly before 6 p.m. on April 6, 1997, one day after Fultz and Bizot were shot, the defendant unexpectedly arrived at Carpenter's office and asked to meet with him. Carpenter agreed to meet with the defendant, but asked the defendant to wait a short time until Carpenter concluded his meeting with another parishioner. The defendant agreed, but appeared angry. Carpenter resumed his meeting, but just a few minutes later, he heard the door in the outer office open and went out to see who had arrived. Seeing the defendant, Carpenter nodded and turned to go back into his office. However, the defendant "leaped out from the couch" and "screamed my name out, just as loud as he could scream it." Carpenter described the defendant, who was pointing a gun at him, as "really angry." The defendant fired the gun once, striking Carpenter in the hand. The bullet traveled through Carpenter's hand and into his lung, liver, and diaphragm. Carpenter survived the shooting and was able to give the police information leading to the defendant's arrest. Carpenter's only explanation for the shooting was that the defendant became angry that Carpenter was unable to meet with him when he arrived.[4]

Dr. Melvin Goldin, a board certified psychiatrist, treated the defendant from February of 1991 to February of 1995, meeting with the defendant on seventeen or eighteen times occasions during this period. Dr. Goldin testified that the defendant had been under the care of Dr. Richard Luscomb since January of 1988, and that he remained under the care of a psychologist from 1991 to 1995. Dr. Goldin noted that the defendant was hospitalized in 1988 due to "growing sadness, irritability, . . . and some alcohol problems," and again in 1989 and 1990 due to suicidal thoughts. At the initial

---

[4]For this shooting, the defendant was convicted of attempted voluntary manslaughter. See Flake I, 88 S.W.3d at 540.

meeting with Dr. Goldin, the defendant and his father reported that the defendant was having a great deal of trouble with obsessions and that he was hostile toward his mother, swinging at her and breaking things. Also at this initial interview, the defendant reported having homicidal thoughts toward people who frustrated him. As an example, the defendant referred to an incident a few days earlier where a woman honked her horn at him while he was driving. Dr. Goldin diagnosed the defendant with obsessive-compulsive disorder. During his four years of treatment, Dr. Goldin prescribed a variety of medications for the defendant, including Anafranil, Clomipramine, Imipramine, Palamor, Nortriptyline, Norpramine, Prozac, and lithium, in an attempt to find the medication that worked best for the defendant. Dr. Goldin testified that the defendant's condition fluctuated but that he experienced some improvement, particularly after he prescribed Anafranil. Dr. Goldin recalled that at his last session, Mr. Flake thought the medication was not working and should be discontinued, but the defendant disagreed, so the medication was not discontinued. Dr. Goldin testified that the defendant was not functioning very well at their last meeting.

On cross-examination, Dr. Goldin admitted that he referred the defendant to Dr. Johnson because she specialized in treating addictions and dependencies; she was "tough"; and the defendant needed a change of pace. Dr. Goldin also acknowledged that the defendant did not report auditory hallucinations during his four years of treatment, and he did not diagnose the defendant with schizophrenia during that time. According to Dr. Goldin, the defendant's compulsions largely related to his appearance. Dr. Goldin had not reviewed any records of the defendant's treatment since 1995 and did not offer an opinion on the defendant's mental status at the time these offenses were committed. However, when asked by defense counsel whether or not a person suffering from schizophrenia knows right from wrong, Dr. Goldin responded, "unless a person is so totally scrambled that he just has no contact with reality, he can usually tell the difference between right and wrong. However the material that he's basing his decision on might distort what he chooses to do."

Testifying next was Dr. Lynne Zager, a clinical psychologist and Director of the Forensic Services Program at Midtown Mental Health Center. Dr. Zager evaluated the defendant pursuant to a court order from October 17, 1997 to January 28, 1998, to determine his competency to stand trial and his mental state at the time of these shootings. In conducting the evaluation, Dr. Zager personally interviewed the defendant four times, and she reviewed the results of psychological tests previously administered. Dr. Zager opined that the defendant suffered from paranoid schizophrenia, a severe mental disease or defect. She also opined that he had not been able to appreciate the wrongfulness of his conduct in shooting the victims. According to Dr. Zager, schizophrenia sufferers experience false fixed beliefs, possible hallucinations, and judgment problems. She recalled that the defendant had a number of delusional beliefs. For example, the defendant expressed fear that television personality David Letterman was part of a conspiracy to cause him harm because Mr. Letterman had on one occasion said, "Hi Mike, from Tennessee." The defendant also thought an inmate at the Shelby County jail was notorious serial killer Jeffrey Dahmer, and he believed another inmate had stolen a letter written to him by his father and was plotting to harm his father. The defendant claimed to hear voices and believed that his thoughts were being broadcast to other people. When asked why he killed the victims, the defendant told Dr. Zager that one victim was

responsible for the 1993 World Trade Center bombing and the other victim was responsible for the bombing of the Oklahoma City federal building. The defendant explained that he had killed the victims to protect society, himself, and his family. When asked why he did not go to the police for help, the defendant claimed that the police were part of a major conspiracy.

Dr. Zager admitted that the defendant had a history of polysubstance abuse, alcohol and marijuana in particular, but she said the defendant had indicated that he was sober when these shootings occurred. Dr. Zager also acknowledged that during his ten years of mental health treatment the defendant had failed to report auditory hallucinations and did not report hearing voices until after his arrest, however, she said his failure to report hearing voices did not change her diagnosis or her thoughts about his condition.

On cross-examination, Dr. Zager admitted that the defendant believed the victims were homosexual and said they made him feel uncomfortable because they were "huggy, touchy, feely, kind of people." Dr. Zager related that the defendant said he had a list of 140 names, that he had been planning to kill them and that he did not believe he "would be caught." Dr. Zager conceded that the defendant's score on the Minnesota Multi-Phasic Personality Inventory–Second Edition ("MMPI-II") was indicative of malingering, and she acknowledged that the defendant gave inconsistent answers when questioned about when he began experiencing auditory hallucinations, on one occasion saying the voices began after he was jailed and on another occasion saying he had heard voices all his life. Dr. Zager also acknowledged that John Perry, the coordinator of mental health services at the Shelby County jail, advised Dr. Zager's team that the defendant was not really sick and that he was "pulling one" on the evaluation team. Finally, Dr. Zager agreed that no tests were conducted to determine whether the defendant had been drinking when these offenses were committed, and she acknowledged that drug use can induce symptoms similar to those exhibited by schizophrenia sufferers.

Also testifying for the defense was Dr. Samuel Craddock, a clinical psychologist employed at Middle Tennessee Mental Health Institute ("MTMHI") to conduct forensic evaluations. Dr. Craddock examined the defendant for a thirty-day period in November and December of 1997, pursuant to a court order. During this time he met personally with the defendant on nine occasions and administered a battery of tests to assess the defendant's intelligence, personality, reasoning, judgment, visual, and processing skills. Dr. Craddock testified that psychological testing revealed that the defendant was within the average range of intelligence and possessed college-level reading comprehension, but that his logic and reasoning skills were equal to that of a fifth-grader. Dr. Craddock opined that these test results were consistent with mental illness and inconsistent with malingering, explaining that malingerers generally experience deficits in both reading comprehension and reasoning. As further support for his conclusion that the defendant was not malingering, Dr. Craddock pointed to the defendant's high score on a visual skills test and his score on a test specifically designed to determine if a patient is malingering schizophrenia symptoms. While Dr. Craddock admitted that the defendant's score on the MMPI -II suggested a strong likelihood of malingering or symptom exaggeration, he explained that the score could also be the result of severe mental illness or random responses. Dr. Craddock also admitted that the defendant's

initial scores on the Personality Assessment Inventory ("PAI") were indicative of malingering, but Dr. Craddock had re-scored the test using upgraded software, and he opined that the revised scores were consistent with paranoid schizophrenia. Dr. Craddock referred to the defendant's expressed delusional beliefs as further indications of this mental illness. For example, Dr. Craddock said the defendant claimed to know who was responsible for the Value Jet crash in Florida, the 1993 World Trade Center bombing, and the Oklahoma City bombing.

Relying on the psychological test results, the defendant's history and treatment records, and the defendant's performance in the psychiatric unit, Dr. Craddock diagnosed the defendant with paranoid schizophrenia and opined that he had been suffering from this severe mental illness at the time of these shootings. Having so concluded, however, Dr. Craddock acknowledged that the defendant "had some test scores to say he might be malingering and I'm not going to rule out the possibility, at any time, that he might be malingering." Furthermore, Dr. Craddock was unable to answer to a reasonable degree of certainty whether or not the defendant could distinguish between right and wrong at the time he committed these crimes. Of the defendant's perceptions Dr. Craddock said, "Some things that he perceived would be right under our perceptions and other things would not be." Dr. Craddock gave the following example:

> If I were to ask Mr. Flake, "Is it wrong to shoot or assault somebody, can you get arrested for it?" Without hesitation, he can recognize the criminality of his alleged actions. However, as he saw the world, not as it existed, but as he believed the world to be, he thought what he was doing was morally justified and essentially it was appropriate actions.

On cross-examination, Dr. Craddock acknowledged that the defendant's scores on the PAI and the MMPI-II were indicative of malingering and that when the defendant arrived at MTMHI, he indicated he intended to plead "not guilty by reason of insanity," stating, "I didn't think I'd get caught. I thought I was doing society a favor." Dr. Craddock agreed that the defendant's use of the word "caught" indicated that he had an understanding of right and wrong and realized the shootings were wrong. Dr. Craddock acknowledged that, despite ten years of prior mental health treatment, the defendant had not been diagnosed as schizophrenic and had not reported auditory hallucinations prior to his arrest. Dr. Craddock testified that the defendant had no good explanation for why he had never told other mental health professionals about hearing voices, stating only, "No, I didn't tell them, I felt it was their job, that's what they get paid for." Dr. Craddock further related that the defendant fears homosexuals, fears they will approach him because he is confused about his sexual identity, and believed the victims were homosexual. The defendant also told Dr. Craddock that he and Mike Fultz were initially friendly, but that he came to hate Fultz because the wages Fultz paid the defendant were never enough. Furthermore, Dr. Craddock agreed that the defendant's records reflected criminal convictions for vandalism, malicious mischief, and driving under the influence of an intoxicant and an arrest in 1992 for arguing with a bouncer at a nightclub. Finally, Dr. Craddock acknowledged that the defendant reported he had used illegal drugs and alcohol since the eighth grade, including marijuana, LSD, inhalants, and speed.

Testifying next for the defense was Dr. Rokeya Farooque, a psychiatrist employed by the State of Tennessee at MTMHI. In November and December of 1997, Dr. Farooque evaluated the defendant for a thirty-day period to determine his competency to stand trial and his mental state at the time of these offenses. Dr. Farooque stated that during this time she saw the defendant once every "two, three, or four days," that the defendant did not receive any medication, that he reported hearing voices, and that he experienced delusional thinking. The defendant also talked about receiving messages through the television. She confirmed that the defendant believed that one victim was responsible for the Oklahoma City bombing and the other was responsible for the 1993 World Trade Center bombing. Dr. Farooque stated that the defendant claimed that he was an FBI agent and that he was doing society a favor by taking care of these terrorists. According to Dr. Farooque, the defendant repeatedly said, "I did not do anything wrong." At the end of the initial evaluation, the forensic team, including Dr. Farooque, determined that the defendant was not competent to stand trial. After the trial court found the defendant incompetent to stand trial, he returned to MTMHI for ten months before his transfer to Western Mental Health Institute ("Western"), a less secure psychiatric facility in Bolivar, Tennessee. Dr. Farooque treated him during this period as well. Based upon her evaluation and treatment, Dr. Farooque diagnosed the defendant with paranoid schizophrenia, which she described as a very serious mental disease marked by auditory hallucinations, fixed false beliefs, disorganized affect, and negative symptomology. She testified that the defendant's history reflected a gradual decline in his mental health, characteristic of schizophrenia sufferers. Dr. Farooque concluded that on the day of these shootings, the defendant was suffering from paranoid schizophrenia, that he was not malingering, and that he did not understand the wrongfulness of his conduct in shooting the victims.

On cross-examination Dr. Farooque admitted that the defendant had not reported auditory hallucinations prior to his arrest in this case, despite ten years of prior mental health treatment. She also acknowledged that malingering is always a concern when a person does not report hearing voices until after his or her arrest. She discounted the concern in this case, stating that the defendant had always reported hearing voices while at MTMHI. Dr. Farooque admitted that the defendant had given inconsistent answers to questions about when the voices began, and she recalled that the defendant said he had not reported the voices prior to his arrest because no one had previously asked him. Finally, Dr. Farooque acknowledged that the defendant had completed college level criminal justice courses.

Dr. John Aday, a psychologist employed at Western, observed the defendant several times per week after his transfer from MTMHI, and he interviewed the defendant once every three months. Dr. Aday and the forensic team at Western evaluated the defendant to determine his competency to stand trial. While Dr. Aday concluded that the defendant was suffering from paranoid schizophrenia and believed himself to be an FBI agent who was performing his duty by shooting the victims, Dr. Aday concluded that the defendant was competent to stand trial in February of 1999, some two years after the shootings. However, Dr. Aday admitted that the defendant still reports hearing voices, although he describes the voices as less prominent and says he is unable to understand them. At the time of trial, the defendant was being treated with Haldol, Zyprexta and Amitriptyline. Dr. Aday

opined that the defendant's condition likely would not improve with further treatment. Dr. Aday did not evaluate the defendant to determine his competency at the time these offenses were committed.

Testifying next for the defense was Dr. Hilary Linder, a psychiatrist employed at Western. Dr. Linder began treating and evaluating the defendant in November of 1998, after the defendant had been declared incompetent to stand trial, with the goal of assisting the defendant attain his competency. Dr. Linder opined that the defendant suffers from paranoid schizophrenia and is not malingering. Dr. Linder also was of the opinion that the defendant was not able to appreciate the wrongfulness of his conduct in shooting the victims.

On cross-examination Dr. Linder conceded that despite ten years of prior mental health treatment, the defendant had not been diagnosed as schizophrenic or reported auditory hallucinations prior to his arrest. Dr. Linder indicated that the defendant had admitted past drug abuse and claimed that he never thought to mention hearing voices until he was arrested because he believed everyone heard the voices. Dr. Linder further indicated that the defendant gave varied reports on when the voices began, at one point saying it began more than two years earlier and at another point saying it began in early adolescence. Dr. Linder also acknowledged that the defendant tested positive for amphetamines when he was admitted to Western in November of 1998 and that no follow-up tests were performed to determine if the result was a false positive. Dr. Linder further agreed that the defendant sometimes falls asleep in group meetings and that drugs such as Haldol and Zyprexa, if overprescribed, can cause a patient to sleep excessively. Finally, Dr. Linder agreed that, when observed, the defendant's affect was blunted to flat and his mood was unhappy and depressed, but when he was interacting, the defendant's affect was moderately blunted to broad and his mood was normal. Furthermore, Dr. Linder acknowledged that the defendant participated in recreational activities at Western, that he enjoyed the bus rides where patients are driven through and around Bolivar, but that he did not enjoy or participate in the dances, where male and female patients danced together.

The defendant's final expert witness was Dr. John Hutson, a clinical psychologist hired by the defendant's family, who met with the defendant in the Shelby County Jail on April 8, 1997, three days after the shootings. Dr. Hutson said he initially was struck by the defendant's impeccable, "male model" appearance, which is not typical of incarcerated, mentally ill individuals. Nevertheless, Dr. Hutson said the defendant had a flat affect and was reluctant to speak with him because of instructions from defense counsel to remain silent. The defendant freely spoke with Dr. Hutson only after his attorney instructed him to do so, but according to Dr. Hutson, the defendant's thoughts were disorganized. Dr. Hutson reviewed the records of the defendant's ten-year history of psychiatric treatment, including in-patient treatment, and talked with some of the defendant's treating psychologists and psychiatrists. Dr. Hutson also administered several tests including the MMPI-II. According to Dr. Hutson, the results of this test were indicative of schizophrenia, not malingering. Dr. Hutson, who had evaluated over 10,000 individuals, described the defendant as one of the three most disturbed criminal defendants he had seen in his career. Dr. Hutson opined that the defendant suffers from schizophrenia, undifferentiated-disorganized type, and that because of this severe mental illness, the defendant could not appreciate the wrongfulness of his conduct in shooting the

victims. According to Dr. Hutson, the defendant believed he was working for the government as an agent or an enforcer when he shot the victims. Dr. Hutson also opined that the defendant has a "pathological fear" that he is homosexual and that it would have been "extraordinarily dangerous, at that time, if you were a man" to have touched the defendant.

On cross-examination, Dr. Hutson admitted that the defendant expressed hatred for Turner Carpenter, whom he shot on Sunday, April 6, 1997, because Carpenter was effeminate and touched him. The defendant also told Dr. Hutson that he would have continued killing, had he not been "caught" because he hated them. Dr. Hutson reiterated his belief "that any physical contact with Mr. Flake would be very dangerous on any male's part."

The defense rested at the conclusion of Dr. Hutson's testimony, and the State offered no rebuttal proof. The jury returned a verdict finding the defendant guilty of first degree murder, thereby implicitly rejecting the insanity defense. The trial court entered a judgment in accordance with the jury's verdict. The defendant appealed, arguing in the Court of Criminal Appeals that he had met his burden of establishing the insanity defense by clear and convincing evidence and that the jury had erred in rejecting the defense. The intermediate appellate court agreed, and referring to the intermediate appellate court decision in Flake I, stated, "[i]t is our view that if the defendant proved the defense of insanity in the Carpenter case, the evidence offered here is even clearer and more convincing . No rational trier of fact could have found otherwise." Accordingly, the Court of Criminal Appeals modified the judgment to not guilty by reason of insanity and remanded the case to the trial court for further proceedings pursuant to Tennessee Code Annotated section 33-7-303.

Thereafter, the State filed an application for permission to appeal, arguing that the Court of Criminal Appeals erred in modifying the jury's verdict. We granted the State's application to consider this case in light of the majority decision of this Court in Flake I.

### Insanity Defense

We begin our analysis of the issue in this appeal with Tennessee Code Annotated section 39-11-501, which provides as follows:

> Insanity. (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
>
> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

(c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

Tenn. Code Ann. § 39-11-501. As we recognized in Flake I, under this statute, the defense applies only when the defendant has a severe mental disease or defect which results in the defendant's being "unable to appreciate the nature or wrongfulness of such defendant's acts." 88 S.W.3d at 550. Furthermore, this statute squarely places upon the defendant the burden of establishing the defense by clear and convincing evidence, and unlike prior law, the State has no obligation to offer evidence establishing the defendant's sanity. Id. Evidence is clear and convincing when "there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." Id. at 551 (quoting State v. Holder, 15 S.W.3d 905, 911( Tenn. Crim. App. 1999), perm app. denied (Tenn. 2000)). Furthermore, this statute prohibits both prosecution and defense experts from offering opinion testimony on whether or not the defendant was sane at the time the offense was committed, declaring that the ultimate issue is "a matter for the trier of fact alone." Tenn. Code Ann. § 39-11-501(c); see also, Flake I, 88 S.W.3d at 551.

In light of this statute, this Court held in Flake I that appellate courts in Tennessee should apply a reasonableness standard of appellate review when evaluating a jury's rejection of the insanity defense. 88 S.W.3d at 554. While this is an appropriately deferential standard of review, it does not completely insulate the jury verdict. Id. Specifically, we held that "appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence." Id. In so holding, we explicitly rejected "the notion that the State must rebut defense proof of insanity with substantial evidence," noting that the current statute clearly imposes no burden on the prosecution. Id. However, we recognized that once the insanity defense is interposed, the prosecution will likely attempt, in some manner, to counter the defense proof, either by expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense experts. Id. In determining whether the jury appropriately rejected the insanity defense, we emphasized that appellate courts must consider all the evidence in the record, including the defendant's actions and words at or near the time of the offense and the lay and expert testimony. Id. (citing State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995); State v. Jackson, 890 S.W.2d 436, 440 (Tenn. 1994); Edwards v. State, 540 S.W.2d 641, 647 (Tenn. 1976)). Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as factual disputes raised by the evidence, are for the trier of fact; appellate courts are not in the business of re-weighing the evidence or re-evaluating credibility determinations. Flake I, 88 S.W.3d at 554 (citing Holder, 15 S.W.3d at 912). Considering the evidence in this record in accordance with these now settled principles, this Court concludes that a reasonable trier of fact could have found the defendant failed to show by clear and convincing evidence that, as a result of a severe mental illness or defect, he was unable to appreciate the wrongfulness of his actions.

-16-

First, the record contains evidence suggesting the defendant was not suffering from a severe mental illness at the time of the offense. As much as two weeks and as little as one day prior to these shootings, the defendant had the forethought to falsely answer questions regarding his prior mental health treatment and drug abuse which, had he answered truthfully, likely would have precluded him from obtaining the weapon used to commit these crimes. See also Flake I, 88 S.W.2d at 555. In addition, as in Flake I, the proof showed that, while the defendant behaved strangely during the weeks and months preceding these shootings, his behavior on the day after these shootings had been, in the words of his father, "[p]erfectly, fine." Mr. Flake described April 6, 1997, as a "regular day" for the defendant, stating that he came downstairs, hugged and kissed his mother, ate breakfast, worked on his car, took his dog to the park, grilled outside with his family, and made plans to watch a movie later that night. While one of the defendant's co-workers testified that the defendant's work performance was poor and his behavior strange on the day of these shootings, this co-worker previously had complained about the defendant's work performance and generally described the defendant as "out there." While the shootings were not expected, there is proof in the record to suggest that the defendant had felt animosity toward the victims. Several witnesses testified that the defendant was preoccupied with homosexuality. Dr. Hutson said the defendant had a "pathological fear" of being homosexual and opined that it would have been "extraordinarily dangerous, at that time, if you were a man" to have touched the defendant. The record also reflects that the defendant said the victims made him uncomfortable because they were "huggy, touchy, feely kind of people," and that he suspected they were homosexual. Furthermore, the defendant expressed hostility and hatred toward Mike Fultz because he sent the defendant to a house that was guarded by three or four dogs, he sank boats in the Gulf of Mexico to collect insurance proceeds, and he refused to pay the defendant well. While the defense proof suggested the defendant committed these crimes because he believed the victims were terrorists and he an FBI agent doing a service to society, the prosecution developed alternative explanations through cross-examination. Lending further credence to the prosecution's theory was testimony from Dr. Goldin that the defendant reported having homicidal thoughts towards individuals who frustrated him and testimony from Mr. Flake that the defendant had physically assaulted his mother and father in the past.

Also, like Flake I, defense proof that the defendant suffered from a severe mental illness was countered by testimony elicited on cross-examination suggesting that it was also plausible that the defendant was malingering. As in Flake I, all the mental health experts offering an opinion testified that the defendant suffers from schizophrenia. The proof is undisputed, however, that, throughout ten years of prior mental health treatment, the defendant had not been diagnosed as schizophrenic and had never complained of auditory hallucinations. Significantly, the defendant's report of auditory hallucinations following his arrest was not spontaneous but was in response to a question from his mother. The defendant thereafter gave inconsistent answers as to when the voices began, and according to Dr. Craddock, he had no "good" explanation for why he had failed to previously report hearing voices, stating on one occasion that he had not previously reported the voices because the mental health experts did not ask him and stating on another occasion that he did not report the voices because he thought "everyone heard the voices." Results of two psychological tests indicated that the defendant was malingering mental illness, and even though the expert witnesses discounted these results, Dr. Craddock refused to "rule out the possibility . . . that [the defendant] might be

malingering." Furthermore, the mental health coordinator at the Shelby County Jail, who saw the defendant on a regular basis after his arrest, believed the defendant was malingering. The proof also showed that, before his arrest, the defendant had been enrolled in and completed criminal justice courses at both UT-Martin and the University of Memphis. During his intake interview at MTMHI, the defendant was familiar enough with the criminal justice system to advise Dr. Craddock that he intended to plead not guilty by reason of insanity. Furthermore, according to psychological records of the defendant's mental health treatment prior to his arrest, he had a history of polysubstance abuse and had lied to his parents about the extent to which he abused drugs and alcohol. In fact, Mr. Flake testified that the defendant's emotional problems began at age twelve, also the age at which the defendant began drinking alcohol. Mr. Flake acknowledged the defendant's treating physician at the time of these shootings, Dr. Johnson, believed he was an alcoholic and a drug addict. Although the experts testified that the defendant's history of substance abuse had no impact on their evaluations since he had been incarcerated and had no access to drugs, Dr. Linder admitted that the defendant tested positive for amphetamines when he arrived at Western and no test was performed to confirm this result was a false positive. Dr. Zager also admitted that no tests were performed to determine whether the defendant was intoxicated at the time these offenses were committed, although she testified that no information relating to the offenses indicated that he was intoxicated.

Finally, notwithstanding expert proof to the contrary, the record contains proof suggesting that the defendant realized his conduct was wrongful. With the exception of Dr. Craddock, the mental health professionals who offered an opinion on the defendant's competency testified that the defendant had been unable to appreciate the wrongfulness of his conduct in shooting the victim.[5] Dr. Craddock opined that the defendant was aware that killing is wrongful, but he opined that the defendant felt morally justified in shooting these victims because he believed them to be terrorists. However, the prosecution pointed out that the defendant did not report his successful elimination of these "terrorists" to law enforcement authorities. While some testimony indicated that the defendant believed the police were part of the conspiracy, other testimony indicated that the defendant trusted his father, so the defendant's failure to report the successful elimination of these "terrorists" to his father, an FBI agent, is a factor the jury could have considered in rejecting the insanity defense. Moreover, at the time of his arrest, the defendant appeared to realize he had committed a crime. The defendant indicated that he knew why the officers were at his house, and in response to questioning, he told them the weapon was in the glove compartment. When asked if he had an altercation at the A.A. meeting, he again responded in the affirmative, and when further asked, "what happened," he responded, "I shot the guy." Although the defendant showed little emotion and appeared "tired," the officers observed no bizarre behavior. After his arrest, the defendant complied with his attorney's instruction not to speak with anyone alone, refusing to speak to Dr. Hutson until receiving permission from his attorney. Evidence suggested that the defendant had feelings of hostility toward all the victims because he believed them to be homosexual, and hostility toward Mike Fultz in particular because of his low wages and his belief that Fultz was fraudulently collecting insurance proceeds. The defendant had previously reported having homicidal thoughts toward persons who

---

[5]Neither Dr. Goldin nor Dr. Aday offered an opinion on the defendant's mental status at the time these offenses were committed.

frustrated him. The defendant had thought about purchasing a gun for some time, falsely completed the paperwork so that he could obtain the gun, picked up the gun on the first day it became available, and committed these crimes the very next day. When discussing these shootings with mental health professionals, the defendant said that he had 140 names on a list, that he had intended to kill them all, and that he did not believe he would be "caught." Dr. Craddock agreed that the use of the word "caught" indicates that the defendant recognized that his actions were wrongful. Finally, when asked by defense counsel if a schizophrenia sufferer knows right from wrong, Dr. Goldin responded, "unless a person is so totally scrambled that he just has no contact with reality, he can usually tell the difference between right and wrong. However the material that he's basing his decision on might distort what he chooses to do."

> It is appropriate to reiterate the following points made in Flake I:
> Where the proof is contested, appellate courts should rarely reverse a jury's rejection of the insanity defense . . . . [A]ppellate courts are not fact finders, and reversal is not appropriate where the evidence might appear to us clear and convincing were we fact finders. Appellate courts do not re-weigh the evidence or re-assess credibility determinations. These tasks are within the province of the jury. While the proof in this record indicates that the defendant suffers from a mental disorder, such proof does not mandate a jury finding that a defendant is legally insane. Cf. Coe v. State, 17 S.W.3d 193, 221 (Tenn. 2000) ("[T]he existence of a mental disorder does not automatically translate into a finding of incompetency to be executed."); Reed, 997 F.2d at 334 ("Insanity, for our purposes, is a legal term. We do not ask whether Reed is insane by psychiatric or psychological standards."). In determining whether a defendant is insane, a jury is entitled to consider all the evidence offered, including the facts surrounding the crime, the testimony of lay witnesses, and expert testimony. While a jury may not arbitrarily ignore evidence, a jury is not bound to accept the testimony of experts where the evidence is contested. Indeed, this principle is explicitly reflected in the current statute which prohibits experts from testifying on the ultimate issue of the defendant's sanity and reserves this issue for the trier of fact alone.

88 S.W.3d at 556. In reversing the jury's verdict, the Court of Criminal Appeals' opinion appears not to have considered the evidence elicited by the prosecution through vigorous cross-examination. The intermediate appellate court instead focused upon the State's failure to offer rebuttal proof. As noted in Flake I, the statute does not require the prosecution to offer rebuttal proof, although the prosecution likely will counter defense proof by some means, including vigorous cross-examination. After reviewing all the evidence in this record in the light most favorable to the State, this Court is unable to conclude that no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence. Therefore, that portion of the judgment of the Court of Criminal Appeals modifying the jury's verdict to not guilty by reason of insanity is reversed.

## Suppression

The defendant argued in his brief to this Court that the trial court erred in denying his motion to suppress because he was not mentally capable of knowingly and intelligently consenting to a search or waiving his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed.2d 694 (1966). The State claims that collateral estoppel precludes the defendant from re-litigating this issue. As support for this claim, the State points out that the claim was explicitly rejected in an opinion on petition to rehear in <u>Flake I</u>, 88 S.W.3d at 561, that the parties are the same, and that the evidence is the same. While collateral estoppel likely could be applied in this circumstance, having thoroughly reviewed the entire record, we choose to address the defendant's contention on its merits.

"[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." <u>State v. Odom</u>, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." <u>Id.</u>; <u>see also</u> <u>State v. England</u>, 19 S.W.3d 762, 766 (Tenn. 2000). As such, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" <u>See</u> <u>State v. Carter</u>, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting <u>State v. Keith</u>, 978 S.W.2d 861, 864 (Tenn. 1998)). Applying these principles, we are of the opinion that the evidence does not preponderate against the trial court's finding that the defendant was mentally capable of knowingly and intelligently consenting to a search and of waiving his rights under <u>Miranda</u>. Accordingly, the defendant's assertion that the trial court erred in denying his motion to suppress is without merit.

## Conclusion

Reviewing this record in the light most favorable to the State, this Court reverses that portion of the judgment of the Court of Criminal Appeals modifying the verdict to not guilty by reason of insanity. As to the suppression issue, the judgment of the Court of Criminal Appeals is affirmed. The judgment of the trial court is reinstated. It appearing that the defendant is indigent, costs on appeal are assessed to the State of Tennessee, for which execution may issue if necessary.

_____
FRANK F. DROWOTA, III,
CHIEF JUSTICE