IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Submitted on Briefs December 15, 2021

**STATE OF TENNESSEE v. WAYNE DAVID JONES**

**Appeal from the Criminal Court for Davidson County**
**No. 2016-A-250     Mark J. Fishburn, Judge**

_____

**No. M2020-00871-CCA-R3-CD**

_____

The Defendant, Wayne David Jones, was convicted by a jury of two counts of reckless homicide, one count of aggravated child abuse, and one count of child neglect, for which he received an effective twenty-five-year sentence. On appeal, the Defendant argues that the evidence was insufficient to support his convictions because the jury improperly weighed conflicting expert medical testimony regarding the thirteen-month-old victim's head trauma and cause of death. Following our review, we find that the evidence was sufficient to support the Defendant's convictions. However, we determine error with the classification of the Defendant's child neglect conviction as a Class A misdmeanor and the imposition of a misdemeanor sentence. Accordingly, we vacate the conviction and sentence for child neglect and remand for entry of a modified Class E felony child neglect conviction and for the trial court to impose a corresponding felony sentence. In all other respects, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed in Part; Modified in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and CAMILLE R. MCMULLEN, J., joined.

Jay Umerley (on appeal), and Nathan Cate (at trial), Nashville, Tennessee, for the appellant, Wayne David Jones.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman and Ronald J. Dowdy, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

This case arises from the January 2015 death of the Defendant's girlfriend's thirteen-month-old son, H.E. ("the victim").[1] Thereafter, on February 12, 2016, the Davidson County Grand Jury charged the Defendant with two alternative counts of first-degree felony murder (during the perpetration of aggravated child abuse or aggravated child neglect); one count of aggravated child abuse; one count of aggravated child neglect; one count of child abuse (during a period of time before the child's death from August 1, 2014, to January 21, 2015); and one count of child neglect (during a period of time before the child's death from August 1, 2014, to January 21, 2015).[2] See Tenn. Code Ann. §§ 39-13-202, -15-401, -15-402. Prior to trial, the State dropped the charges of child abuse and child neglect. From October 28 through November 4, 2019, the Defendant was tried by a jury on the remaining four charges.

At the Defendant's trial, the State adduced the following evidence. The victim's mother, M.H.,[3] had three children, and the Defendant came to live with M.H. and her three children around September of 2014. In January of 2015, at the time of this incident, Ivyon was seven years old, Ilijah[4] was four years old, and the victim was thirteen months old. The Defendant, who worked at FedEx during the early morning hours, began providing childcare for the boys about a month before the victim's death. The victim's father, Hakeem E., had provided care for all three boys in the past, even though Ivyon and Ilijah were not his biological children. Ivyon's and Ilijah's paternal grandmother, some other relatives, and a couple of babysitters had also provided childcare for the children.

On the morning of January 21, the Defendant got off work at FedEx and returned home about 6:00 a.m. The victim's mother got Ivyon on the school bus and then departed for work between 7:15 a.m. and 7:30 a.m., leaving the victim and Ilijah in the Defendant's care. According to the victim's mother,[5] earlier that morning, at about 4:00 a.m., the victim awoke crying. The victim's mother reported that the victim "cried out in pain like

---

[1] It is the policy of this court to refer to minor victims by their initials.

[2] The grand jury also indicted the victim's mother for first-degree felony murder, aggravated child neglect, aggravated assault, and aggravated child endangerment based upon her knowledge that the Defendant was abusing the victim. Her case was severed from the Defendant's.

[3] In an effort to further protect the victim's identity, we will refer to the victim's mother by her initials, to the victim's biological father by his first name and the initial of his last name because the victim and his father share the same initials, and to the victim's half-siblings by their first names only because they share a common surname and the same initials.

[4] Iljah's name is spelled variously throughout the record. We will spell his name as he spelled it for the court reporter at trial.

[5] These facts were summarized by the detective who interviewed the victim's mother several times. The victim's mother invoked the Fifth Amendment and did not testify at the Defendant's trial.

something was hurting." Because this behavior was unusual, the victim's mother continued to be concerned, so she put the victim in the bed with her. When the victim woke up again about 6:30 a.m., the victim appeared to be fine. The Defendant and the victim were asleep when the victim's mother left the house.

The Defendant said that he let the victim sleep until about 10:30 a.m.[6] After the victim awoke, the Defendant changed the victim's "real messy" diaper, gave the victim some milk, fed the victim a Hot Pocket, and let the victim watch some television. According to the Defendant, the victim was acting normally that morning and took his bottle as usual. The victim and Ilijah played together for a while before Ilijah went outside around noon. Later, the Defendant gave the victim some chips for a snack and fed the victim some shrimp for lunch around 1:30 p.m. The Defendant called Ilijah inside to eat some shrimp as well. The victim ate the shrimp without incident, according to the Defendant.

The Defendant said that around 2:15 p.m., the victim seemed sleepy and did not want to drink his milk, so he put the victim down for a nap in the victim's playpen in the bedroom. The Defendant said that although the victim dropped his milk and was dropping his head, the victim seemed to be breathing and acting normally when he put him down for a nap. Also, Ilijah had gone back outside to play around this time. According to the Defendant, a few minutes later, he went to check on the victim and noticed that the victim was lying awkwardly on his side and would not wake up. The Defendant described that the victim's eyes were "halfway open and halfway closed." The Defendant explained that he tried to "shake [the victim's] face" but that the victim did not respond. The Defendant called the victim's mother at 2:21 p.m., but she did not answer. One minute later, the Defendant sent the victim's mother a text message saying she "ain't [sic] got time to hoe [sic] off today." The victim's mother tried to call the Defendant back at 2:32 p.m., but he did not answer. She tried again a minute later, and the Defendant still did not answer. The Defendant said that during this time period, he was trying to call the victim's mother, pacing around, and was "just anxious" waiting for her to call.

The Defendant called the victim's mother back at 2:37 p.m. and told her that something was wrong with the victim. After the short phone call ended, the victim's mother sent a text message to the Defendant at 2:39 p.m., asking him to check the victim's breathing. The Defendant then took a video using the Glide application ("Glide app") on his cell phone and sent it to the victim's mother at 2:40 p.m. In the video, the victim appeared lifeless as the Defendant slapped his hand against the victim's cheek, and the Defendant stated that he did not know how to check for breathing. The Defendant and the

---

[6] The Defendant did not testify at trial. He made various statements to medical personnel and investigating officers about the events that took place after the victim's mother left the house. He also made a reenactment video for one of the officers.

victim's mother spoke once more at 2:48 p.m. for twenty-seven seconds, and during this call, the victim's mother told the Defendant that she was going to call 911 after the Defendant said he did not how to check for breathing or perform CPR.

The victim's mother called 911 at 2:49 p.m. She told the operator that she had been informed by the Defendant that the victim had "been acting weird" because the Defendant had fed the victim shrimp and that the victim was not presently alert or responsive. She relayed that she was on her way home to check on the victim. When the operator asked her if the victim was breathing, she responded, "[The Defendant] said he is. Yes." In response to her call, the 911 operator called the Defendant at 2:53 p.m. The Defendant told the operator that the victim was not awake, but he asserted that he did not know how to tell if the victim was breathing. In response to questioning, the Defendant said that the victim's chest was not "going up and down" and that the victim had vomit in his mouth. The operator directed the Defendant to lay the victim on the floor and clear the vomit from the victim's mouth. The operator then instructed the Defendant how to begin performing CPR on the victim. The Defendant said that when he first lifted up the victim's shirt to begin CPR, he noticed a mark on the victim's chest. While the Defendant was attempting CPR, emergency personnel arrived on the scene, and the call ended. According to the Defendant, Ilijah came inside with the emergency responder.

On the reenactment video, there was vomit visible on the floor that the Defendant said was from the victim. The Defendant explained that when he started CPR, the victim "gasped and threw up."

Nashville Fire Department ("NFD") Captain Robert Friedmann, along with other emergency personnel, was dispatched to the residence in response to a report of child's having an allergic reaction. Upon Captain Friedmann's arrival at the apartment, the Defendant answered the door and led Captain Friedmann to the victim's location in the apartment. NFD Fire Engineer David Rives accompanied Captain Friedmann to the scene. Captain Friedmann testified that the victim had no pulse and was not breathing. Engineer Rives also described that the victim was lifeless and in need of medical attention. Captain Friedmann had Engineer Rives carry the victim to the paramedics. Engineer Rives said that he began CPR on the victim as he was carrying the child to the ambulance. Engineer Reeves accompanied the victim in the ambulance while en route to Vanderbilt Children's Hospital. Engineer Reeves explained that according to protocol, the paramedics would have taken over CPR and continued such prior to their arriving at the hospital.

Once at the hospital, Emergency Room personnel were able to restart the victim's heart, but the victim never regained the ability to breathe without being intubated and hooked up to a ventilator. The victim was declared "brain dead" on January 23, 2015. On January 25, some of the victim's organs were removed for donation, and then his body was sent to the medical examiner for autopsy.

- 4 -

The victim's brother Ilijah, who was eight years old at the time of trial, testified and relayed details from the day the victim was taken to the hospital. Ilijah testified that the victim was crying that day, so Ilijah went to check on him. The Defendant was eating and watching television at that time, according to Ilijah. The victim had a dirty diaper, so Ilijah told the Defendant. The Defendant changed the victim's dirty diaper, and Ilijah went outside to play for a short time. When Ilijah returned inside, the Defendant fed the victim hot wings and chips, though, Ilijah said that the victim's mother had specifically forbidden the Defendant from feeding the victim hot wings. The Defendant also fixed Ilijah a sandwich and some shrimp for lunch; Ilijah did not see the Defendant feed any shrimp to the victim. According to Ilijah, later, the victim started choking on one of the chips, and the Defendant attempted to assist the victim by patting him on the back. Ilijah testified that he then saw the Defendant drop the victim on the victim's head, after which the victim, as he lay on the floor, vomited, closed his eyes, and cried out in an abnormal way.

When the Defendant was at the hospital later that afternoon, he sent a text message to someone named "Sheeka" saying that he fed a one-year-old baby shrimp and that the baby was about to die. Also, later, while the Defendant and the victim's mother were being interviewed at the hospital, the Defendant sent the victim's mother a text message telling her not to "interrogate" Ilijah, claiming that Ilijah had been outside during the relevant events. After the victim's mother texted the Defendant that she was not mad at him, the Defendant sent her a reply text message, saying, "I'm mad cuz [sic] it's all kinds of stuff I'm thinkn [sic] I cudve [sic] done different."

The victim's mother's brother, A.H., testified that he last saw the victim on the Monday before the victim was taken to the hospital on Wednesday of that same week. A.H. described the victim as "pretty upbeat, more active[.]" A.H. said that the he picked the victim up and played with him for a short time and that the victim was laughing.

On the evening of January 21, 2015, after the victim had been taken to the hospital, A.H. spoke with the Defendant, who told A.H. that he had fed the victim shrimp and laid him down for a nap, but that he had forgotten to take the victim a bottle. So, the Defendant returned to the victim's bedside and attempted to give him a bottle; however, the victim was not "waking up like kind of like how babies sleep and want to stay asleep." Because the victim would not take the bottle, the Defendant left the bottle there for the victim in case he woke up, and the Defendant returned to the living room. The Defendant relayed to A.H. that when he went back to check on the victim again about ten to fifteen minutes later, the victim was unresponsive.

H.E. presented at the hospital with severe injuries and was in critical condition. Gabriel Acevedo, a detective with the Nashville Metro Police Department ("NMPD"), Youth Services Division, testified that he responded to Vanderbilt's Children Hospital on January 21 and photographed the victim. Detective Acevedo described the victim as "in

pretty bad shape." One photograph showed a significant bruise to the right side of victim's forehead, and additional photographs reflected that the victim had bruising or marks to his chest, neck, shoulder, and lips. According to Detective Acevedo, there was also a new bruise developing on the right side of the victim's rib cage, which was pointed out to him by the nurses. Detective Acevedo agreed that the bruises on the victim's chest could have been from CPR and that there appeared to be a scar on the victim's right leg.

Detective Sarah Bruner also arrived at the hospital, and she spoke with the Defendant. During the interview, the Defendant consistently denied having any knowledge of how the victim obtained his injuries. When Detective Bruner asked the Defendant why he did not call 911 after noticing that the victim was unresponsive, the Defendant indicated that he did not think "it was serious," noted that the victim's mother was on her way home from work, and stated that in his experience, 911 did not respond quickly to a call. The Defendant also told Detective Bruner that he was "feeling guilty it happened on [his] watch" and that there was "some stuff that [he] could have did [sic] and could have not did [sic]." When Detective Bruner asked the Defendant what he could have done differently, the Defendant said, "Could have not dozed off or wanted to sleep as much. I couldn't [sic] have let him run freely in the house, unwatched in the rooms."

After interviews were completed at the hospital, Detective Acevedo went to the apartment where the family was living and took photographs of the scene. One photograph showed remnants of a shrimp exoskeleton on the floor by the trash can, and another reflected "shrimp tails" inside the trash can. There were also some chips seen on a dining room table and in the refrigerator.

Detective Bruner interviewed the Defendant again on January 29, 2015, at the apartment where the Defendant and the victim were living. She had the Defendant conduct a reenactment of the events precipitating the victim's death, and this reenactment was recorded.

Regarding the nature of the victim's injuries, the State presented testimony from Dr. Verena Brown, who was declared an expert in child abuse pediatrics; Dr. Brown examined the victim on January 21, 2015, while he was in intensive care. The State also presented testimony from the Davidson County medical examiner, Dr. Erin Carney, who was declared an expert in forensic pathology; Dr. Carney performed the victim's autopsy. Drs. Brown and Carney opined that the victim died after sustaining rotational injury, or "acceleration/deceleration" injury, to his brain, as evidenced by retinal hemorrhages and by bleeding and swelling in his brain. Dr. Carney testified that the cause of death was multiple blunt force injuries and that the manner of death was homicide.

Drs. Brown and Carney testified that they considered the victim's presentation and history when forming their opinions. Moreover, Dr. Brown interviewed the Defendant,

both of the victim's biological parents, and J.B., Ivyon and Ilijah's paternal grandmother, in order to obtain a family history, social history, and the victim's past medical history. The Defendant told Dr. Brown that he was not aware of any past significant medical history of the victim's and that he was not aware of the victim's having any significant injuries prior to January 21. The victim's biological parents informed Dr. Brown that the victim had eczema "when he was baby," that he had a "sickle cell trait," and that he had a virus prior to Christmas, necessitating a visit to the emergency room; according to the parents, the victim had since recovered from the virus and was doing well. In addition, Dr. Brown opined that a sickle cell trait would not generally have led to "any symptoms of anything at all." Dr. Brown noted in her report that the victim was developmentally normal for his age. Dr. Brown also spoke with Detective Bruner.

Dr. Carney testified that upon autopsy, she did not observe any medical condition that would have led to the victim's injuries. In addition, Dr. Carney did not see any evidence of a sickle cell trait, but she did find that the victim had a "hemoglobin C trait"; however, she explained that there was no medical condition that arose from the hemoglobin trait.

Regarding the victim's social history, it was reported that the victim was with his biological father from Thursday January 15, 2015, to January 18, 2015. The Defendant informed Dr. Brown that the victim was acting normal when he returned home on January 18. Though the victim had other babysitters, the Defendant reported that the victim had not been in the care of any of those sitters since the victim's January 18 return home.

The victim's mother showed Dr. Brown the cell phone video that the Defendant had taken and sent to her using the Glide app. According to Dr. Brown, the victim was clearly not breathing in the recording and "look[ed] dead." The victim's mother told Dr. Brown that she had noticed bruises on the victim over the previous month, stating that the bruises were not there when she put the victim to bed but were there when she woke him up in the morning. The victim's mother also informed Dr. Brown that when the victim awoke crying earlier that morning, she attended to the victim, and he was "easily consoled." The victim's biological father told Dr. Brown that he noticed recurring facial bruises on the victim over the past month, especially when he picked up the victim from the victim's mother's residence.

Drs. Brown and Carney said that the victim's behavior before 2:15 p.m. as described by the Defendant—playing, eating, drinking, acting normally—was not consistent with the victim's having a brain injury prior to that time. However, the victim's behavior at 2:15 p.m., when the victim refused milk, and after—fussiness, sleepiness, vomiting, trouble breathing, and eventually being unresponsive and limp—was consistent with the infliction of a recent brain injury. Dr. Brown explained that had the victim's brain been injured at some time earlier, then multiple caregivers would not have described the victim's behavior

as normal that morning, as well as normal in the days leading up to that morning. Dr. Brown said that the victim's injuries were not from an allergic reaction to shrimp but were "most consistent with a diagnosis of abusive head trauma." When asked if this meant that the victim was shaken, Dr. Brown said that shaking in and of itself could have caused the victim's injuries, but it also could have been from an impact and shaking, noting the victim's bruise to his forehead. Dr. Brown further stated that although the exact amount of force needed to cause injuries like the victim's was unknown, "that someone observing this injury to a child would [have] know[n] that the child [was] at risk of being killed."

Dr. Brown testified that the victim's condition—his not breathing normally and becoming unresponsive—should have "absolutely" alerted the Defendant to call 911 and that the Defendant should have immediately done so rather than take a video. According to Dr. Brown, the victim would have been in pain from his various injuries while he was conscious, and it would not be "appropriate" for a caretaker to allow the victim to linger in this condition thirty minutes or more before calling 911. In her report, Dr. Brown noted the critical nature of the victim's injuries and that he was not likely to survive his injuries. Dr. Brown stated that it was crucial to get help quickly in such a situation and call 911 in a timely fashion, though she could not say for certain whether the victim would have survived had he received immediate treatment, noting the severity of his injuries. However, she opined that "[m]aybe something could have changed" and "that there [was] definitely a chance" the victim could have survived had he received medical intervention sooner; she further noted that the victim's pain from his broken bones would have been eased had he received prompt treatment. Dr. Carney provided a similar opinion, stating that it was "possible" if the victim had received medical intervention sooner that he might have survived, explaining that it might have slowed the swelling in the victim's brain and avoided depriving his brain of oxygen; she said he would have had "a chance . . . to live through it."

At trial, Drs. Brown and Carney discussed six sets of injuries that bore on their opinions: hemorrhages in and around the brain, retinal hemorrhages, possible compression fractures of some vertebrae, a fracture of the left humerus, a broken rib, and bruises to the victim's head and face. Drs. Brown and Carney opined that the victim's brain injury, and subsequent death, was the result of abuse. Dr. Brown stated that the victim's "entire constellation of injuries" led to her medical diagnosis of abuse. Dr. Carney gave a similar opinion that the victim's injuries were the result of abuse and stated that it appeared that the victim had been injured on more than one occasion given that he also had some older injuries.

Drs. Brown and Carney both testified at some length about the subdural hemorrhages. Dr. Brown stated that the subdural hemorrhages, like the type seen in the victim, occurred "when there [was] a powerful jostling of the brain back and forth in [the]

head rotating the brain," such as from a car accident. She also discussed the "cascade of badness" that happens following this type of brain injury, where the symptoms are immediate and the deprivation of oxygen and the inflammation of the brain spiral into even greater oxygen loss and greater brain swelling.

Dr. Brown testified that she found evidence of old subdural hemorrhages as well as newer subdural hemorrhages. Dr. Brown said that she could not date the old hemorrhages, but that the acute hemorrhage had to have occurred at the time of the injury that caused the victim's death. Dr. Carney also saw new, recent subdural bleeding as well as some old subdural bleeding. Dr. Carney estimated that the old injuries were a few weeks old, perhaps a month or more, and she explained that if she used the term "chronic" to refer to the old hemorrhage, it only meant that the injury was old, not that it was continually bleeding. According to Dr. Carney, the previous injury was "completely healed" and had no "real bearing" on the new injury, explaining that this was "a new injury on top of that old one." Dr. Brown opined that when a subdural hemorrhage "rebleeds," it generally did not cause any symptoms at all, but was just a normal part of the healing process. Moreover, in Dr. Brown's opinion, the old subdural hemorrhage did not cause the victim's brain "to be more fragile this time."

Dr. Carney testified that the new bleeding had to come from a new injury, that it had to have started about the time of the abuse on January 21, that the victim would have immediately begun to exhibit symptoms, that these symptoms would have continued to progress, and that the victim never would have had a lucid interval after the bleeding started. Dr. Carney opined that this brain injury was not caused by an allergic reaction to shrimp, as well as it being unlikely that the victim sustained his brain injury by falling off a couch onto a carpeted floor. Dr. Carney agreed that the injury could have been caused by an adult's grabbing the victim and dropping him on his head.

Drs. Brown and Carney both discussed the retinal hemorrhages. Dr. Brown testified that the victim had extensive, multi-layer retinal hemorrhages that were "too numerous to count from the optic nerve to the periphery." Dr. Brown stated that this presentation was "classic for rotational injury to the head." Dr. Carney likewise said there was "extensive" hemorrhaging "in all layers of the retina," which she said was consistent with an abusive "acceleration/deceleration" injury, a violent movement of the head, and was "very characteristic of inflicted injury."

Drs. Brown and Carney both testified about some injury in the spine or vertebrae. Dr. Brown testified that she found possible compression fractures to some vertebrae, which she said was "consistent with a diagnosis of child physical abuse." Dr. Brown also testified that bleeding was observed around the victim's spinal cord, which was consistent with the other symptoms of a brain injury. Dr. Carney looked at the possible compression fractures under a microscope, and she said that there was not actually any fracture in the spine.

- 9 -

However, she did see bleeding in some of the nerves coming from the spine. In addition, Dr. Carney gave a description of an "acceleration/deceleration" injury of the type seen in the victim with injury to both the brain and the spinal cord—"basically their head has been moved very quickly forward and back. Maybe they've hit it up against something that's caused it to stop suddenly. That causes tearing of the veins over the top of the brain and bleeding. And it can also cause spinal cord injury." Dr. Carney further opined that the victim's spinal injury was similar to what one would experience in a roll-over car wreck.

Drs. Brown and Carney both discussed a "bucket-handle fracture" through the growth plate of the victim's left humerus. Dr. Brown said that this type of injury required a significant yanking or pulling force and that it was frequently seen in abusive injury along with abusive head trauma cases. Because these injuries were difficult to cause in children around the victim's age, it was "highly concerning for abuse," in Dr. Brown's opinion. Dr. Carney likewise said that this type of injury was common in child abuse given the force required to cause it, that the injury was not something a child of the victim's age could accidentally do to himself, and that the injury was "inflicted." Dr. Brown further stated that this injury had to have happened "recently" and would have been painful. Dr. Carney, who looked at the injury under a microscope, testified that it was an acute fracture; that it was likely inflicted on January 21, "close[] to the time that [the victim became] unresponsive"; that it would have been painful; and that the victim would not have been acting normally.

Drs. Brown and Carney both testified that the victim had a new fracture to a rib that had been fractured previously and was in the process of healing. Dr. Brown said that the original fracture was "seven to ten days old" when it was discovered post-mortem. Dr. Carney said that the older fracture probably occurred somewhere between January 17 and January 20 and that it was probably fractured again during CPR. Dr. Brown indicated that it took more force to break a child's rib than an adult's.

Drs. Brown and Carney both testified that there were various bruises to the victim's face, some in places where a child would not normally injure themselves. Dr. Brown noted that the victim's bruises to his forehead and cheek, in addition to signs of abusive head trauma, concerned her that there was an impact to the head. Dr. Carney testified that some of these bruises were consistent with someone grabbing the victim's face, as well as the victim's overall injuries possibly being caused by someone grabbing the victim by the face and slamming him down onto something. However, both Drs. Brown and Carney said that the bruises to the victim's lip could have come from the intubation process, and Dr. Brown said that she did not consider those bruises as an indicator of abuse.

The Defendant presented testimony from Dr. Ronald Uscinski, who was declared an expert in the field of neurosurgery and neuroscience. Dr. Uscinski opined that the victim did not suffer a new brain injury, explaining that there was no "mechanical injury" to the

victim's brain and that the victim's death was caused by oxygen deprivation to the brain. Dr. Uscinski said that there was an old hemorrhage that was "weeks or months" old, but he did not see any evidence of any brain trauma associated with that injury. He could not say with any certainty how the prior brain injury occurred, though it did not "necessarily have to be a major injury." Dr. Uscinski reasoned that rebleeding from a chronic hemorrhage added pressure to the victim's brain, which then compromised the victim's respiratory system, which in turn deprived the brain of oxygen and led to the symptoms seen in the victim and his death.

Dr. Uscinski agreed that there was some fresh bleeding around the brain, but he claimed that this bleeding leaked out of the old hemorrhage and was not from a new injury. Dr. Uscinski stated that the hemorrhage occurred outside the victim's brain and caused blood to accumulate entirely outside the brain. He explained, "So you can get persistent oozing into a chronic subdural hematoma, which looks like fresh blood. And it is fresh blood, but that doesn't mean it's a fresh injury. It just means that the normal healing mechanism is going awry." Dr. Uscinski said that an old subdural hemorrhage could start to rebleed spontaneously or with something as simple as a cough or vomiting. He opined that the bleeding here was caused by a single injury "that occurred at a much earlier point in time."

Dr. Uscinski stated that the autopsy report confirmed his conclusions, noting that this fresh blood seen in the victim's brain was "associated with a subdural membrane," which took weeks to form, and was indicative of "a process that [had] been going on for a much longer time than a few hours." He further observed that had the victim suffered a new head trauma, then there would be "some sort of injury to the scalp" or a skull fracture, some sort of "mechanical disruption of the brain tissue itself." When asked why a physician might think this was two separate distinct subdural hemorrhages, Dr. Uscinski replied,

> If an imaging study is done and all you can rely on is the imaging study, never having been inside a head operatively, never having actually done the surgery, it may look like it's two separate entities. But when you actually open the head up and operate on the brain, you can really see that they're connected.

Dr. Uscinski testified that he reviewed the victim's birth records, the medical records from Vanderbilt Children's Hospital, and the autopsy report in forming his opinions. Dr. Uscinski indicated that he was provided a timeline of relevant events and that he reviewed the photographs taken of the victim while in the hospital. However, he acknowledged that he did not review the 911 recordings or the Glide app video, that he was not provided with the photographs or the slides from the victim's autopsy, that he did not review the police reports, and that he did not interview Ilijah, the victim's brother, who

was also in the house that day.  Dr. Uscinski said that he did not consider important whether the Defendant confessed to abusing the victim that day, whether the autopsy photographs reflected bruising on the victim's forehead, or whether the victim's arm was broken, as none of these pieces of information would have changed his medical opinion.

When Dr. Uscinski was asked about whether the victim would have lived had his brain not been deprived of oxygen, Dr. Uscinski replied, "He may very well have.  It's impossible to say and it would be speculating, but the thing that he died from was oxygen deprivation."  He also opined that the subdural hemorrhage was not "a life-threating condition."

Dr. Uscinski acknowledged that he had been censured by the American Association of Neurological Surgeons for providing biased testimony in abusive head trauma cases of child victims and for not considering evidence outside of just the brain.  He indicated that he was censured due to his "unpopular" opinion disagreeing with the prevailing concept of "shaken baby syndrome" in the late 1990's and early 2000's.  However, he acknowledged that he was censured in 2012.

The Defendant also presented testimony from Ivyon and Ilijah's paternal grandmother, J.B.  J.B. testified that she had seen bruises on her grandsons after they had spent time in the care of Hakeem E., the victim's father, and that they frequently seemed scared to be around him.  She further stated that after Hakeem E. no longer cared for Ivyon and Ilijah, the children's unusual behavior stopped.

The State recalled Dr. Carney.  Dr. Carney clarified that her reports documented an actual injury to the brain and bleeding on the brain itself.  Dr. Carney explained that she found "areas of patchy subarachnoid hemorrhage on the surface of the brain," an intraparenchymal hemorrhage in the brainstem, and "bleeding in the nerves exiting that part of the brain."  She stated that she disagreed with Dr. Uscinski's opinion that this was a simple rebleed and affirmed her belief that an acute event caused the hemorrhage and victim's death.  Dr. Carney reasoned,

> This old subdural appeared much older, and there were not a lot of entrapped blood vessels that I could find.  It is born[e] out in the literature that, when you do have a rebleed in a child, it is often and most commonly asymptomatic and limited.  It would not cause this child to develop hypoxia.
>
> If it is an ongoing issue where it's accumulating and causing trouble for the child, it's going to be a progressive downhill slide and could be addressed.

The other issue here is this subdural bleeding is not his only injury. It's not the only indication of what has happened to him.

Dr. Carney also said that "retinal hemorrhages of this pattern and this severity" do not occur simply from CPR or hypoxia. Furthermore, it was not appropriate, in Dr. Carney's opinion, for Dr. Uscinski to make a diagnosis about the brain without considering the other injuries that the victim sustained.

Following the conclusion of proof, the jury convicted the Defendant of reckless homicide as a lesser-included offense of both felony murder charges, aggravated child abuse as charged, and child neglect as a lesser-included offense of aggravated child neglect. Thereafter, the trial court sentenced the Defendant to four years for each homicide conviction (and merged those convictions), twenty-five years for the aggravated child abuse conviction, and eleven months and twenty-nine days for the child neglect conviction. The trial court aligned all of the sentences concurrently for a total effective sentence of twenty-five years to be served at 100%.

The Defendant filed a motion for new trial, alleging the trial court erred in various evidentiary rulings and in sentencing, and arguing the verdict was inconsistent and against the weight of the evidence. The trial court heard and denied the motion, and this appeal followed.[7]

## ANALYSIS

The Defendant appeals, challenging the sufficiency of the evidence supporting his convictions. Specifically, he asserts that the trier of fact "failed to give proper weight to Dr. Uscinski's expert opinion regarding the victim's cause of death" and erred by rejecting this opinion in favor of the testimony from the State's experts. The State disagrees, responding that credibility determinations of testimony from conflicting experts are within the jury's province.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness

---

[7] On June 23, 2020, the Defendant filed a request for this court to accept a late-filed notice of appeal. This court granted the request and held that the notice of appeal would be deemed timely filed.

credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Reckless homicide is defined as the "reckless killing of another." Tenn. Code Ann. § 39-13-215(a).

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(31). As relevant to this case, "[a] person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a)[, . . .] and . . . [t]he act of abuse . . . results in serious bodily injury to the child[.]" Tenn. Code Ann. § 39-15-402(a)(1). Section 39-15-401(a) defines child abuse as "[a]ny person who knowingly, other than by accidental means, treats a child . . . in such a manner

as to inflict injury[.]" Tenn. Code Ann. § 39-15-401(a).  The aggravated child abuse statute provides that

> "[s]erious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects.

Tenn. Code Ann. § 39-15-402(d).  Section 39-15-401(b) defines child neglect as "[a]ny person who knowingly abuses or neglects a child . . . so as to adversely affect the child's health and welfare[.]"  Tenn. Code Ann. § 39-15-401(b).  When the victim of child neglect or aggravated child abuse is eight years of age or less, the offense is elevated to a Class E and Class A felony, respectively.  Tenn. Code Ann. §§ 39-15-401(b), -402(b).

Most of the Defendant's trial centered around the interpretation of the victim's injuries given by the three medical experts—Drs. Brown and Carney for the State, and Dr. Uscinski for the Defendant.  The Defendant's sufficiency argument is simply that the jury "improperly weighed expert medical testimony" by rejecting Dr. Uscinski's opinion and, instead, adopting the testimony from the State's expert witnesses that the Defendant "caused the acute injury to the victim."  The trier of fact determines the weight given to scientific theories and the resolution of competing scientific views.  McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997) (citation omitted).

The State's proof at trial established that the thirteen-month-old victim died from severe brain injuries inflicted while in the Defendant's care.  The Defendant first observed the victim as acting oddly at 2:15 p.m.—the victim's seeming sleepy, not wanting to drink his milk, and dropping his milk and head; so, the Defendant put the victim down for a nap.  When the Defendant returned to check on the victim a few minutes later, he noticed that the victim was lying awkwardly on his side in his playpen and would not wake up.  The Defendant described the victim's eyes as "halfway open and halfway closed."  The Defendant explained that he tried to "shake [the victim's] face" but that the victim did not respond.  The Defendant first phoned the victim's mother at 2:21 p.m. concerned for the victim's well-being at that time.

After an exchange of text messages and phone calls, the Defendant and the victim's mother finally spoke at 2:37 p.m., which was sixteen minutes after the Defendant initially found the victim unresponsive in his playpen.  When the victim's mother asked the Defendant to check the victim's breathing, the Defendant, using his cell phone, sent a Glide app video to the victim's mother.  In the video, the victim appeared lifeless as the Defendant

slapped his hand against the victim's cheek and stated that he did not know how to check for breathing. The victim's mother phoned 911 at 2:49 p.m.

Some thirty-two minutes after the Defendant found the victim unresponsive, 911 called the Defendant at 2:53 p.m. and instructed him on how to perform CPR on the victim. While Drs. Brown and Carney could not say for certain that the victim would have survived had he received immediate help for his injuries, they both indicated that it was a possibility. Even Dr. Uscinski testified that the victim "may very well have" lived had his brain not been deprived of oxygen. The Defendant said that during this time period, he was trying to call the victim's mother, pacing around, and was "just anxious" waiting for her to call. When the Defendant was asked why he did not call 911 sooner, the Defendant indicated that he did not think "it was serious," noted that the victim's mother was on her way home from work, and stated that in his experience, 911 did not respond quickly to a call. The Defendant also told Detective Bruner that he was "feeling guilty it happened on [his] watch" and that there was "some stuff" that he could have done differently, though he failed to give any specifics.

Ilijah testified that he saw the victim choking on some chips, that the Defendant attempted to assist the victim by patting the victim on the back, and that he then observed the Defendant drop the victim on the victim's head. Thereafter, according to Ilijah, the victim, as he lay on the floor, vomited, closed his eyes, and cried out in an abnormal way. The Defendant tried to subvert any questioning of Ilijah once at the hospital, going as far as to say that Ilijah did not see anything and that he was outside during the relevant time frame.

Drs. Brown and Carney opined that the victim died after sustaining rotational injury, or "acceleration/deceleration" injury, to his brain, as evidenced by retinal hemorrhages and by bleeding and swelling in his brain. Dr. Brown stated that the subdural hemorrhages, like the type seen in the victim, occurred "when there [was] a powerful jostling of the brain back and forth in [the] head rotating the brain," such as from a car accident. She also discussed the "cascade of badness" that happens following this type of brain injury, where the symptoms are immediate and the deprivation of oxygen and the inflammation of the brain spiral into even greater oxygen loss and greater brain swelling. Dr. Carney said there was "extensive" hemorrhaging "in all layers of the retina," which she said was consistent with an abusive "acceleration/deceleration" injury, a violent movement of the head, and was "very characteristic of inflicted injury." Dr. Carney further opined that the victim's spinal injury was similar to what one would experience in a roll-over car wreck. Dr. Carney testified that the cause of death was multiple blunt force injuries and that the manner of death was homicide. Dr. Brown stated that although the exact amount of force needed to cause brain injuries like the victim's was unknown, "that someone observing this injury to a child would [have] know[n] that the child [was] at risk of being killed."

- 16 -

In addition to his brain injuries, the victim also suffered a broken humerus bone and refracture to a rib that had been previously fractured. Relative to the "bucket-handle fracture" through the growth plate of the victim's left humerus, Drs. Brown and Carney testified that such injury was caused only by significant force and was concerning for abuse. Dr. Brown stated that the injury occurred "recently," and Dr. Carney indicated that it was an acute fracture and that it was likely inflicted on January 21, "close[] to the time that [the victim became] unresponsive." Both doctors opined that the victim would have been in visible distress from the break. Relative to the rib refracture, both doctors indicated that the rib had been broken previously and was in the process of healing at the time it was refractured. Dr. Carney said that the rib was probably fractured again during CPR.

Drs. Brown and Carney indicated that they reviewed and examined all of the victim's pertinent medical records, social history, and family history; that they examined the victim's body; and that they described why all of the various injuries together could only be explained by an abusive injury sustained while in the Defendant's care. Dr. Brown stated that the victim's "entire constellation of injuries" led to her medical diagnosis of abuse. Dr. Brown noted that the victim's bruises to his forehead and cheek, in addition to signs of abusive head trauma, concerned her that there was impact to the head.

Dr. Carney gave a similar opinion that the victim's injuries were the result of abuse, and she agreed that the injury could have been caused by an adult's grabbing the victim and dropping him on his head. Dr. Carney testified that some of the victim's facial bruises were consistent with someone grabbing the victim's face, as well as the victim's overall injuries possibly being caused by someone grabbing the victim by the face and slamming him down onto something. Both doctors testified that the victim's injuries were not caused by an allergic reaction to shrimp and that the victim's symptoms would have only gotten progressively worse following the injury.

On the other hand, Dr. Uscinski's testimony indicated that he did not consider the totality of the victim's injuries, and he acknowledged that he did not review the 911 recordings or the Glide app video, that he was not provided with the photographs or the slides from the victim's autopsy, that he did not review the police reports, and that he did not interview Ilijah, the victim's brother, who was also in the house that day. In addition, Dr. Uscinski confirmed that he had been censured in 2012 by the American Association of Neurological Surgeons for providing biased testimony in similar cases and for not considering evidence outside of just the brain.

Furthermore, Dr. Uscinski's expressed his disagreement with the medical concept of "shaken baby syndrome" and indicated that such was not the reason for the victim's death. However, Dr. Brown was asked if her medical conclusions in the victim's case meant that the victim was shaken, and Dr. Brown said that shaking in and of itself could have caused the victim's injuries but that they also could have been from an impact and

shaking, noting the victim's bruise to his forehead. Dr. Carney was recalled as a rebuttal witness and confirmed that her reports documented an actual brain injury and brain bleeding. Dr. Carney explained that she found "areas of patchy subarachnoid hemorrhage on the surface of the brain," an intraparenchymal hemorrhage in the brainstem, and "bleeding in the nerves exiting that part of the brain." She specifically stated that she disagreed with Dr. Uscinski's opinion that this was a simple rebleed and affirmed her belief that an acute event caused the hemorrhage and victim's death. Dr. Carney further stated that "retinal hemorrhages of this pattern and this severity" do not occur simply from CPR or hypoxia. Dr. Carney opined that it was not appropriate for Dr. Uscinski to make a diagnosis about the brain without considering the other injuries that the victim sustained.

Here, the trial court properly instructed the jury pursuant to Tennessee Pattern Criminal Jury Instruction 42.02, on how to receive and consider expert testimony. A rational trier of fact could have accredited the testimony of Drs. Brown and Carney, and we will not disturb the jury's conclusion in this regard. See State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) ("The weight and value to be given expert testimony is a question for the jury."); accord State v. Flake, 114 S.W.3d 487, 507 (Tenn. 2003) ("While a jury may not arbitrarily ignore evidence, a jury is not bound to accept the testimony of experts where the evidence is contested."). Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions. See, e.g., State v. Joshua Iceman, No. M2016-00975-CCA-R3-CD, 2017 WL 4805118, *27 (Tenn. Crim. App. Oct. 24, 2017) ("affirm[ing] that the trier of fact determines the weight given to scientific theories and the resolution of competing scientific views" under similar facts).

At this juncture, we are required to note an anomaly in the misdemeanor conviction and sentence for child neglect. The Defendant was indicted for and the jury was charged with child neglect of the victim, who was less than eight years old, a Class E felony. See Tenn. Code Ann. § 39-15-401(b). Though the jury's verdict was for a Class E felony, the State recommended a misdemeanor sentence, and without further discussion, the trial court imposed a sentence of eleven months and twenty-nine days for this conviction. Nonetheless, the appropriate classification for the Defendant's child neglect conviction was a Class E felony, and he was a Range I, standard offender, which carried a sentencing range of one to two years. See Tenn. Code Ann. § 40-35-112(a)(5). The jury found all the elements of the greater offense to be supported beyond a reasonable doubt, and the trial court's misclassification amounts to a sentence that is contrary to law. Accordingly, the Defendant's misdemeanor conviction and sentence are vacated. Given that a greater sentence must imposed, we believe the best course is to remand the Class E felony child neglect conviction for resentencing.

CONCLUSION

In accordance with the foregoing, we find that the evidence is sufficient to support the Defendant's convictions. However, we vacate the misdemeanor conviction and sentence for child neglect for the reasons stated in this opinion. The case is remanded for entry of a modified Class E felony conviction for child neglect, as well as for resentencing on the Class E felony. In all other respects, the judgments are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE